# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

*United States of America v. Jacob Dillon Cotton*

Case No. 1:25-CR-00002-TMB-MMS

By:               THE HONORABLE TIMOTHY M. BURGESS

PROCEEDINGS:     ORDER FROM CHAMBERS

The matter comes before the Court on Defendant Jacob Dillon Cotton's Motion for Judgment of Acquittal/New Trial (the "Motion").[1] The Government filed a Response in Opposition.[2] For the reasons discussed below, the Court **DENIES** Cotton's Motion at Docket 126.

The Court assumes the parties' familiarity with the underlying facts.

### A. Procedural Background

Cotton was charged by Indictment with Conspiracy to Distribute and to Possess with the Intent to Distribute Fentanyl Resulting in Death (Count 1) and Distribution of Fentanyl Resulting in Death (Count 2).[3] Trial on those charges took place March 18, 2026, through March 25, 2026.[4] On March 24, 2026, Cotton moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, which was denied by the Court.[5] On March 25, 2026, Cotton was found guilty on Counts 1 and 2 of the Indictment, and the jury found unanimously that the fentanyl distributed by Cotton had resulted in the deaths of J.C. and A.B., as charged in Counts 1 and 2.[6] With leave of the Court (having found good cause to extend time beyond the 14-day post-trial motions deadline), on April 21, 2026, Cotton filed the Motion now at issue.[7]

---

[1] Dkt. 126 (Defendant's Motion for Judgment of Acquittal/New Trial).

[2] Dkt. 128 (Government's Response in Opposition to Defendant's Motion for New Trial).

[3] Dkt. 2 (Indictment).

[4] *See* Dkt. 105 (Minute Entry for Trial by Jury Day 1); Dkt. 109 (Minute Entry for Trial by Jury Day 2); Dkt. 110 (Minute Entry for Trial by Jury Day 3); Dkt. 111 (Minute Entry for Trial by Jury Day 4); Dkt. 113 (Amended Minute Entry for Trial by Jury Day 5); Dkt. 114 (Minute Entry for Trial by Jury Day 6); *see also* Dkt. 43 (Minute Entry for Trial Scheduling Conference).

[5] Dkt. 126-2 (Defense Exhibit 1, Rough Draft/Unedited Trial Transcript) at 754–62; Fed. R. Crim. P. 29.

[6] *See* Dkt. 114; *see also* Dkt. 119 (Jury Verdict Forms).

[7] *See generally* Dkt. 126; Dkt. 120 (Motion for Extension of Time to File Post-Trial Motions (Non-Opposed); Dkt. 122 (Text Order Granting Expedited Unopposed Motion for Extension of Time) (extending post-trial motions deadline to April 17, 2026); Dkt. 123 (Second Motion for Extension

1

### B. *Legal Standard*

#### 1. Motion for a Judgment of Acquittal

Federal Rule of Criminal Procedure 29 provides that, "[a]fter the [G]overnment closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."[8] "A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later."[9] A court will deny a Rule 29 motion for judgment of acquittal if "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[10] "In ruling on a Rule 29(c) motion, a district court must bear in mind that 'it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts[,]'"[11] and the court "may not usurp the role of the finder of fact by considering how [it] would have resolved the conflicts, made the inferences, or considered the evidence at trial."[12]

#### 2. Motion for a New Trial

Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."[13] "A district court's power to grant a motion for new trial is much broader than its power to grant a motion for judgment of acquittal."[14] When deciding a motion for new trial, "[t]he court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses."[15] As a result, there may be circumstances where, "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence

---

of Time to File Post-Trial Motions (Non-Opposed) (filed April 15, 2026); Dkt. 125 (Text Order Granting Unopposed Motion for Extension of Time) (extending post-trial motions deadline to April 21, 2026).

[8] Fed. R. Crim. P. 29.

[9] Fed. R. Crim. P. 29(c)(1).

[10] *United States v. Charley*, 1 F.4th 637, 643 (9th Cir. 2021).

[11] *United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977), *supplemented*, 574 F.2d 476 (9th Cir. 1978) (citing *United States v. Nelson*, 419 F.2d 1237, 1241 (9th Cir. 1969)); *see also United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002) ("Notably, it is not the district court's function to determine witness credibility when ruling on a Rule 29 motion.").

[12] *United States v. H.B.*, 695 F.3d 931, 935 (9th Cir. 2012) (quoting *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc)).

[13] Fed. R. Crim. P. 33(a).

[14] *United States v. Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000) (quoting *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1211 (9th Cir. 1992)).

[15] *Id.* (citing *Alston*, 974 F.2d at 1211).

2

preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred."[16] In these circumstances, the district court "may set aside the verdict, grant a new trial, and submit the issues for determination by another jury."[17]  But such motions "should be granted 'only in exceptional cases in which the evidence preponderates heavily against the verdict.'"[18]

A motion for a new trial based "on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty."[19]  The Supreme Court has held that time limits for a defendant's motion for a new trial grounded on a reason other than newly discovered evidence are inflexible, nonjurisdictional claim-processing rules.[20]  However, "the court on its own may extend the time, or for good cause may do so on a party's motion made . . . before the originally prescribed or previously extended time expires[.]"[21]

3.   Independently Sufficient Cause of Death Under 21 U.S.C. § 841(b)(1)(C)

21 U.S.C. § 841(b)(1)(C) provides that, in the case of an offense under § 841 involving a Schedule I controlled substance and, "if death or serious bodily injury results from the use of such substance[,]" the defendant "shall be sentenced to a term of imprisonment of not less than twenty years or more than life[.]"[22]  If such an offense occurs after the defendant has been convicted of a prior felony drug offense "and if death or serious bodily injury results from the use of such substance[,]" the defendant "shall be sentenced to life imprisonment."[23]

The Supreme Court considered the standard of causation in cases dealing with the sentencing enhancement under 21 U.S.C. § 841(b)(1)(C) in *Burrage v. United States*, holding that,

> at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury.[24]

---

[16] *Id.* at 1097 (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).
[17] *Id.* (quoting *Lincoln*, 630 F.2d at 1319).
[18] *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981) (quoting 2 Wright, Federal Practice and Procedure, Criminal § 553 at 487 (1969)).
[19] Fed. R. Crim. P. 33(b)(2).
[20] *Eberhart v. United States*, 546 U.S. 12, 17 (2005) (noting that failure to raise time limits can result in the forfeiture of arguments based on them but explaining that "district courts must observe the clear limits" of time-based requirements when they are properly raised).
[21] Fed. R. Crim. P. 45(b)(1)(A).
[22] 21 U.S.C. § 841(b)(1)(C).
[23] *Id.*
[24] *Burrage v. United States*, 571 U.S. 204, 218–19 (2014).

3

*Burrage* expressly declined "to address a special rule developed for cases in which multiple sufficient causes independently, but concurrently, produce death."[25] However, courts interpreting *Burrage* have held that the Government may prove that death resulted from use of a drug by demonstrating either that the drug was the *but-for cause* of a decedent's death, or, in situations in which "multiple sufficient causes independently, but concurrently, produce death,"[26] that the drug was an *independently sufficient cause* of death.[27]

### C. Discussion

At the outset, the parties agree that "[a]t trial, Cotton stipulated to the offense conduct of distribution, and the jury was tasked with deciding only the sentence enhancement issue: whether the fentanyl Cotton distributed was the [] cause of [J.C.'s] and [A.B.'s] death[s]."[28] Accordingly, the Court will only address the sentencing enhancement arguments.[29]

    1. <u>Dr. Gallagher's Testimony was Sufficient to Support a Jury Verdict on the Issue of Cause of Death as to Each Decedent.</u>

Cotton argues that the testimony of Dr. Kenneth Gallagher, a forensic pathologist deputy medical examiner at the Alaska State Medical Examiner's Office who performed autopsies on both J.C.

---

[25] *Burrage*, 571 U.S. at 205.

[26] *Id.*

[27] *See, e.g., United States v. Robinson*, 55 F.4th 390, 402–403 (4th Cir. 2022) (holding the Government proved the fentanyl ingested was alone sufficient to kill the decedent under an "independently sufficient" theory of causation despite the autopsy report listing the decedent's cause of death as "combined toxic effects of fentanyl, acetyl fentanyl, and methamphetamine")); *United States v. Feldman*, 936 F.3d 1288, 1313 (11th Cir. 2019) ("If actual causation can be established by proving a factor was necessary to cause a result . . . , it logically follows that actual causation can also be established by satisfying a higher standard for proving that the factor was sufficient, by itself, to cause the result."); *Roundtree v. United States*, 885 F.3d 1095, 1098 (8th Cir. 2018) ("Dr. Goodin's opinion that 'the morphine alone [could] have caused [C.H.'s] death' would permit a reasonable jury to find that Roundtree's offense warranted the [] sentencing enhancement[.]") (internal citations omitted); *Gaylord v. United States*, 829 F.3d 500, 508 (7th Cir. 2016); *United States v. Thompson*, 945 F.3d 340, 344–45 (5th Cir. 2019); *United States v. Spayd*, No. 3:19-CR-00111-JMK, 2023 WL 2890715, at *4 (D. Alaska Apr. 11, 2023); *United States v. Ducasse*, No. 3:16-cr-00017-SLG, 2019 WL 5058583, at *4 (D. Alaska Oct. 7, 2019); *United States v. Snider*, 180 F. Supp. 3d 780, 796 (D. Or. 2016); *United States v. Pearson*, No. 1:19-CR-00013-JLT-SAB-1, 2026 WL 1759560, at *4–6 (E.D. Cal. June 18, 2026).

[28] Dkt. 126 at 1.

[29] *See* Dkt. 119 (Jury Verdict Forms) at 2, 4 ("We, the jury, unanimously find, beyond a reasonable doubt, the fentanyl distributed by the defendant resulted in the death of [J.C.] as charged in Count 1." "We, the jury, unanimously find, beyond a reasonable doubt, the fentanyl distributed by the defendant resulted in the death of [A.B.] as charged in Count 2.").

4

and A.B.,[30] was insufficient to support a jury verdict on the issue of causation of J.C.'s and A.B.'s deaths, as is required for the sentencing enhancement for each count.[31] Instead, Cotton relies upon the testimony of his medical expert, Dr. Jared Brooks, who testified that cardiomegaly (enlargement of the heart) caused the deaths of both men.[32]

a) Dr. Gallagher's Opinion Regarding Whether Fentanyl Toxicity was an Independently Sufficient Cause of Death was Given with Medical Certainty.

Cotton argues that Dr. Gallagher's testimony is not sufficient in part because, when asked if he would opine that fentanyl toxicity was an independently sufficient cause of death, Dr. Gallagher testified, "It can be, yes," as to J.C., and "Yes," as to A.B.[33] Cotton heavily emphasizes Dr. Gallagher's answer to this question as to J.C., asserting that Dr. Gallagher's answer was not given with medical certainty.[34] However, Dr. Gallagher's answer to the immediately preceding question provides context:

Q[:]    Based on your training and experience, do you – even taking into consideration postmortem redistribution, do you still opine that fentanyl is the cause of death in this case?
A[:]    Yes.
Q[:]    Is the amount of fentanyl in Mr. Cook's body sufficient to opine that it is an independently sufficient cause of death?
A[:]    It can be, yes.[35]

This answer does not appear to be the equivocal statement Cotton frames it to be. Moreover, none of the cases cited by Cotton suggest a medical expert need invoke talismanic words in order for his testimony to be considered by a jury.[36] Cotton cites one case by a sister circuit in which the

---

[30] Dkt. 126-2 (Rough Draft of Unedited Trial Transcript) at 463, 470–71, 501.
[31] Dkt. 126 at 2–3.
[32] *Id.* at 8.
[33] Dkt. 126-2 at 501, 510.
[34] *See, e.g.,* Dkt. 126 at 15–16, 18–19.
[35] Dkt. 126-2 at 500–501.
[36] *See* Dkt. 126 at 15 ("Other jurisdictions that have examined analogous issues have opined that a medical expert needs to describe the level of confidence they have in an expressed opinion regarding causation, with the phrase—'reasonable degree of medical certainty' being the gold standard"); *see, e.g., People of the Territory of Guam v. Reyes*, 879 F.2d 646, 649 (9th Cir. 1989) ("although [the medical examiner] did not use the words 'reasonable degree of medical certainty' in his testimony, the record amply demonstrates that he based his testimony on the substantive equivalent thereof."); *see also Schudel v. Gen. Elec. Co.*, 120 F.3d 991, 997 (9th Cir. 1997), *abrogated on other grounds by Weisgram v. Marley Co.*, 528 U.S. 440, 453 (2000) (a civil case in which one expert testified to a "possibility" rather than a "probability" of plaintiff suffering organic

appellate court notes, "[W]hile the particular phrase used ['with a reasonable degree of medical certainty'] *should not be dispositive,* it may indicate the level of confidence the expert has in the expressed opinion."[37]

The Court therefore is not persuaded by defense's argument that Dr. Gallagher's testimony was uncertain or otherwise equivocal as it related to either decedent in general or as it related to J.C. in particular. Dr. Gallagher did express confidence in his opinion about both autopsies; the lack of a specific phrase does not undermine the conclusions to which he testified regarding the decedents' causes of death.

    b) <u>The Amount of Fentanyl in the Decedents' Blood, the Decedents' Opioid Tolerance, and Other Autopsy Findings Do Not Undercut the Government's Forensic Medical Expert's Testimony.</u>

Cotton offers several reasons for giving greater weight to the testimony of defense's medical expert, Dr. Brooks, than to that of Dr. Gallagher; however, each reason is similarly not compelling. Dr. Brooks testified, in effect, that the amount of fentanyl found in each man's blood following post-mortem blood draw (11 ng/ml for A.B. and 31 ng/m for J.C.) are not believable.[38] His reasons for this were that the draw sites (subclavian and the heart) are more susceptible to postmortem redistribution ("PMR")[39] and that Dr. Gallagher did not "adequately" account for opioid tolerance.[40] PMR was described at trial by Dr. Brooks:

> [D]rug concentrations will actually change after death[.] . . . [A]s your body decomposes after death . . . drugs can move from one location into another location, and that can actually artifactually [sic] elevate the toxicology result that you see. It's important to bear in mind that it doesn't depress it. So if postmortem redistribution is a concern -- and it doesn't actually work with all drugs, but fentanyl is one of the drugs that is prone to it -- it would artifactually [sic] elevate the concentration in your toxicology.[41]

---

brain damage from exposure to solvents and testified that medical science has not determined the effects of short-term exposure to such solvents).

[37] *Schulz v. Celotex Corp.*, 942 F.2d 204, 209 (3d Cir. 1991) (emphasis added).

[38] *See* Dkt. 126-2 at 596–98 (in which Dr. Brooks responds to a defense question about PMR's effect on J.C.'s blood sample, "It means you can't believe the number, to put it in plain language."); *id.* at 601.

[39] Dkt. 126 at 10; *see also* Dkt. 126-2 at 594.

[40] Dkt. 126 at 2, 10; *see, e.g.,* Dkt. 126-2 at 615 ("So you should interpret the presence of fentanyl in Mr. Cook's toxicology result within the context of him having time to abuse substances for years and years and years and develop tolerances to a convincing degree.").

[41] Dkt. 130 (Partial Transcript of Jury Trial – Day 4, Testimony of Dr. Jared Brooks) at 28–29.

Dr. Brooks additionally testified that there were three major findings and one minor one which "commonly" appear in opioid deaths—pulmonary edema, cerebral edema, urinary retention, and possibly gastric dysmotility—but that only one of these (pulmonary edema) was recorded by Dr. Gallagher in either decedent's file.[42]

> i. *Dr. Gallagher Testified that He Considered PMR When Calculating the Amounts of Fentanyl in the Decedents' Post-Mortem Blood Draw Results.*

Beginning with the reliability of the post-mortem blood draw results for each man, the Government notes that Dr. Gallagher did, in fact, take PMR into consideration; he recalculated the estimated amounts of fentanyl in the blood of both J.C. and A.B.:

> [S]o those are different ranges that the fentanyl could be, depending on how much redistribution may have occurred. *In both cases, those [adjusted] numbers are high enough, they fall within the NMS Laboratory's range of reported fatalities*, between 0.3 to 110. So[,] *it's still, still in the fatal range* with the [PMR] calculation.[43]

Dr. Brooks testified at trial that reverse-calculating PMR cannot produce a precise calculation.[44] Comparatively, Dr. Gallagher testified that, even taking the highest possible level of PMR coefficient to estimate what J.C.'s level would be without PMR, the level would still be within the fatal range.[45] These differing testimonies[46] were appropriate for a factfinder to weigh and consider, as "[i]t is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts."[47]

> ii. *Dr. Gallagher Testified that He Considered Opioid Tolerance When Forming His Opinion of Cause of Death as to Each Decedent.*

---

[42] Dkt. 126-2 at 622–624; Dkt. 130 at 64–65.

[43] Dkt. 126-2 at 499 (emphasis added).

[44] *Id.* at 591 ("[T]here is no way to then reverse calculate to an accurate precise concentration of drug at the time of death. Now[,] there are some ratios that have been thrown out based on population level data[,] and they can kind of give you a rough guess, but again it's really nothing more than a rough guess if you apply those dogmatically using a formula[.]").

[45] *Id.* at 498–99.

[46] Dkt. 118 (Jury Instructions) at 8 ("You have heard testimony from Dr. Kenneth Gallagher, Dr. Jared Brooks, and Dr. Sherri Kacinko[,] who testified to opinions and the reasons for their opinions . . . *Such opinion testimony should be judged like any other testimony. You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's knowledge, skill, experience, training, or education, the reasons given for the opinion, and all the other evidence in this case*." (emphasis added)).

[47] *United States v. Nelson*, 419 F.2d 1237, 1241 (9th Cir. 1969); *see also United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002);

Additionally, Dr. Gallagher did consider opioid tolerance; he noted that tolerance levels are easily lost after several days.[48]  In conjunction, evidence was presented by the Government that A.B. and J.C. had attempted to obtain fentanyl for a month or more before their deaths.[49]  Concerningly, as the Government notes in its Response,[50] Dr. Brooks, when presented with text messages from A.B. suggesting that Skagway had been "dry for two months," stated it did not impact his opinion about the opioid tolerance of either decedent.[51]  This appears to bear on the credibility of Dr. Brooks's testimony, as a period of abstinence or a "drug holiday" was agreed by both medical experts to have an impact on opioid tolerance.[52]  The Court cannot usurp this duty assigned to the jury but acknowledges that a rational factfinder could have (and did) compare Dr. Gallagher's and Dr. Brook's testimony and find Dr. Gallagher's testimony more credible.[53]

> iii. *The Absence of Certain Findings Documented in the Autopsy Reports is not Conclusive of the Physiology of the Decedents.*

Cotton argues that pulmonary edema, cerebral edema, urinary retention, and gastric dysmotility should have been present in the decedents, as such findings are "commonly" found in opioid deaths.[54]  Regarding the findings which were not specifically documented in A.B.'s and J.C.'s autopsy reports (all but pulmonary edema), the Court notes that such absences are not conclusive of whether these findings were or were not present in either A.B. or J.C.  Dr. Brooks testified that "Dr. Gallagher only documented one of those findings in each of [the decedents'] autopsies[,] and that was pulmonary edema."[55]  From this testimony, the record does not support the absence of these medical findings in A.B. and J.C., only their absence from A.B.'s and J.C.'s *autopsy reports*. The absence of such findings in the *autopsy reports* does not make it more or less likely that either man died of fentanyl toxicity.

---

[48] Dkt. 126-2 at 515 ("Certainly a three to seven-day period is a not uncommon time frame where a significant amount of your tolerance level can be diminished or lost.").
[49] Dkt. 128 at 7–8 (citing Trial Exhibit 16).
[50] *Id.* at 8–9.
[51] Dkt. 126-2 at 691 ("That conversation didn't change anything . . . [f]rom a medical perspective.").
[52] Dkt. 126-2 at 496 (in which Dr. Gallagher states, "[A]s an opiate, the fentanyl itself, if you have a period of abstinence from it or a drug holiday, you can lose your tolerance."); *id.* at 508 (in which the Government asks Dr. Gallagher, "If the evidence shows that Skagway was free from fentanyl until approximately the 12th of January, when a shipment arrived in Skagway, is that significant in your opinion?" and Dr. Gallagher responds, "Yeah. I mean, if he's not having access to it for a period of time, it's a risk for him to overdose."); *see also id.* at 583–85 (in which Dr. Brooks discusses tolerance and cross-tolerance).
[53] *Nelson*, 419 F.2d at 1241.
[54] Dkt. 126-2 at 622–624; Dkt. 130 at 64–65.
[55] Dkt. 126-2 at 624.

8

2. <u>The Testimony of Dr. Gallagher Was Not the Government's Only Evidence Presented at Trial Regarding Causation.</u>

Cotton further contends that "Dr. Gallagher's testimony was the [G]overnment's only evidence regarding medical causation."[56] He argues that Dr. Gallagher's opinion "was not expressed to any degree of certainty" and characterizes such opinion as "equivocal" to conclude that "it was insufficient, even construing all evidence in favor of the [G]overnment[] to support a jury verdict on the issue of causation[.]"[57] The Court disagrees. In addition to the testimony of Dr. Gallagher, the Government presented the testimony of forensic toxicologist Dr. Sherri Kacinko,[58] whose testimony included describing opioid tolerance,[59] quality control in illicit manufacture of fentanyl,[60] the symptoms of fentanyl overdose,[61] PMR,[62] and the metabolites produced by the body from fentanyl consumption or ingestion which were found in A.B.'s[63] and J.C.'s blood samples.[64] The Government additionally called two lay witnesses, Scott Singleton[65] and Blake Perry,[66] who testified to the strength of the fentanyl and its adverse effects on them personally. Although Singleton and Perry are not medical experts, their testimonies do speak to the potency of the drugs at issue and may be considered by the jury when considering the sentencing enhancement. Moreover, the Government submitted Exhibit 81, A.B.'s toxicology report, and Exhibit 82, A.C.'s toxicology report, which underpinned the analyses provided by Drs. Kacinko and Gallagher.[67]

3. <u>The Government's Evidence was Sufficient to Support a Jury Verdict on the Issue of Causation as Required to Find the Sentencing Enhancement for Each Count.</u>

Applying Federal Rule of Criminal Procedure 29, the Court concludes from the reasoning and evidence outlined above that the Government produced sufficient evidence to support jury verdicts

---

[56] *See* Dkt. 126 at 2.
[57] *Id.*
[58] Dkt. 126-2 at 699.
[59] *See id.* at 737, 740.
[60] *Id.* at 736.
[61] *Id.* at 735.
[62] *Id.* at 733–34.
[63] *Id.* at 707, 708–11.
[64] *Id.* at 731–33.
[65] *Id.* at 443, 450 ("Q[:] What did you feel about the condition of these pills? A[:] They were stronger than usual . . . Q[:] And you tell us about your use of those, the remaining pills that you had used. A[:] Well, I guess I was smoking too many in my bathroom, and I ended up passing out and woke up on the floor, felt really sick, didn't look good, so -- Q[:] And how long were you out for? A[:] I have no clue, to be honest with you.").
[66] *Id.* at 370, 381 ("Q[:] And as to the strength of the pills, did you know anything about that or notice anything? A[:] These were strong. It took my breath away. I knew something was wrong. Like real strong. I've done a lot, I've screwed up a lot in my life. These things were not normal.").
[67] *Id.* at 299.

on the sentencing enhancements. Viewing the evidence in the light most favorable to the prosecution, the Court concludes that a rational trier of fact could have found the fentanyl toxicity to be an independently sufficient cause of death for both men. Resultingly, a jury rationally could have found beyond a reasonable doubt (as it did)[68] that the fentanyl distributed by Cotton resulted in the deaths of J.C. and A.B.

    4. <u>A New Trial is Not Warranted, as the Evidence Does Not Preponderate Against the Verdict.</u>

Under Federal Rule of Criminal Procedure 33, the Court concludes for the same reasons that a new trial is not warranted because the evidence does not preponderate "heavily against the verdict [such] that it would be unjust to enter judgment."[69]

The testimony of Dr. Gallagher does not appear to have been given equivocally or with uncertainty. He testified that fentanyl toxicity was an independently sufficient cause of death as to each decedent,[70] and he indicated that he considered opioid tolerance when forming that opinion. [71] Dr. Gallagher also testified that he considered PMR when he calculated the estimated amounts of fentanyl in the blood samples.[72]

Additionally, the Government called Dr Kacinko to testify to the physiological effects of such opioid tolerance and how quickly it can be lost.[73] Finally, two of the Government's lay witnesses, Scott Singleton and Blake Perry, provided testimony regarding the unusual strength of the fentanyl at issue.[74]

Comparatively, the testimony of Cotton's expert witness on the issue of medical causation, Dr. Jared Brooks, was not sufficient to show the evidence presented preponderates against the jury's

---

[68] *See* Dkt. 119 (Jury Verdict Forms) at 2, 4.

[69] *United States v. Martinez*, 924 F. Supp. 1025, 1028 (D. Or. 1996), *aff'd*, 122 F.3d 1161 (9th Cir. 1997) (quoting *United States v. Campbell*, 977 F.2d 854, 860 (4th Cir. 1992)); *see also Pimentel*, 654 F.2d at 545 (quoting 2 Wright, Federal Practice and Procedure, Criminal § 553 at 487 (1969)).

[70] Dkt. 126-2 at 500–501, 510.

[71] *Id.* at 515.

[72] *Id.* at 499.

[73] *Id.* at 737 ("So tolerance is simply when the body is exposed to a drug, such as an opioid, it begins to adapt and the person becomes less susceptible to some of the effects of the drugs. So tolerance develops at different rates for different effects, and over time higher and higher doses are needed to get the same effect as was previously, or as previously needed. When there is a period of recovery or a period of abstinence from the drug, that tolerance will diminish. So the -- you might be tolerant to a certain dose of drugs, and then after a week of not using the drug, you're no longer tolerant to that amount, so you would need to use a smaller amount or you're going to have more severe adverse effects.").

[74] *Id.* at 443, 450, 370, 381.

verdict. In particular, the Court notes that Dr. Brooks's testimony appeared to be self-contradictory. Dr. Brooks testified that text messages from A.B. indicating that Skagway had been "dry for two months" did not impact his opinion about the opioid tolerance of either decedent.[75] This bears on his credibility, as Dr. Brooks emphasized during his testimony that opioid tolerance was the very reason for his difference in opinion with Dr. Gallagher regarding cause of death: "Q[:] Can you explain what you perceive to be the basis for the difference in opinion regarding the cause of death? A[:] Yeah. I can put one word on it. It's tolerance."[76]

From the evidence presented at trial and outlined above, the Court concludes that the evidence does not preponderate against the verdict.

### D. Conclusion

For the foregoing reasons, Cotton's Motion at Docket 126 is **DENIED**.

Entered at the direction of the Honorable Timothy M. Burgess, United States District Judge.

DATE: July 20, 2026.

---

[75] Dkt. 126-2 at 691 ("That conversation didn't change anything . . . [f]rom a medical perspective."); *contrast with id.* at 583–85.
[76] Dkt. 130 at 57.

11